IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| C. R. D., ) | |
| ) | |
|     **Plaintiff,** ) | |
| ) | |
|     v. ) | Case No. CIV-24-1226-ALM |
| ) | |
| **FRANK BISIGNANO,** ) | |
| **Commissioner of Social Security,**[1] ) | |
| ) | |
|     **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

C. R. D.[2] ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1382. (Doc. 1). The Commissioner filed the Administrative Record ("AR") (Doc. 6), and the parties have fully briefed the issues. (Docs. 7, 14).[3] The parties have consented to proceed before the undersigned Magistrate Judge pursuant to 28

---

[1] Frank Bisignano was sworn in as the Commissioner of the Social Security Administration on May 7, 2025, and is therefore substituted as Defendant in this matter, pursuant to Federal Rule of Civil Procedure 25(d).

[2] For privacy purposes in light of the sensitive information disclosed in Social Security cases, the Court refers to Plaintiff by initials only.

[3] Citations to the parties' briefs refer to the Court's CM/ECF pagination. Citations to the Administrative Record refer to its original pagination.

1

U.S.C. § 636(c)(1). (Docs. 11, 12). Based on the Court's review of the record and issues presented, the Court **REVERSES** the Commissioner's decision and **REMANDS** the matter for further proceedings.

I.     **The Disability Standard and Standard of Review**

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is an impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). A medically determinable impairment must be established by "objective medical evidence" from an "acceptable medical source," such as a licensed physician or a licensed and certified psychologist; whereas the claimant's own "statement of symptoms, a diagnosis, or a medical opinion" is not sufficient to establish the existence of an impairment. 20 C.F.R. §§ 404.1521, 416.921; *see id.* §§ 404.1502(a), 404.1513(a), 416.902(a), 416.913(a). A plaintiff is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (explaining five steps and burden-shifting process). To determine whether a claimant is disabled, the Commissioner inquires: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) considering the Commissioner's assessment of the claimant's residual functional capacity ("RFC"),[4] whether the impairment prevents the claimant from continuing claimant's past relevant work; and (5) considering assessment of the RFC and other factors, whether the claimant can perform other types of work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). Plaintiff bears the "burden of establishing a prima facie case of disability under steps one, two, and four" of the SSA's five-step procedure. *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005). If the plaintiff makes this prima facie showing, "the burden shifts to the Commissioner to show the claimant has the [RFC] to perform other work in the national economy in view of [claimant's] age, education, and work experience." *Id.* "The claimant is entitled to disability benefits only if [he or she] is not able to perform other work." *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987).

---

[4] RFC is "the most [a claimant] can still do despite [a claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

This Court's review of the Commissioner's final decision is limited "to determin[ing] whether the Commissioner applied the correct legal standards and whether the agency's factual findings are supported by substantial evidence." *Noreja v. Comm'r, SSA*, 952 F.3d. 1172, 1177 (10th Cir. 2020) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Staheli v. Comm'r, SSA*, 84 F.4th 901, 905 (10th Cir. 2023) (quoting *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010)); *see also Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (defining substantial evidence as "more than a scintilla, but less than a preponderance"). A court's review is based on the administrative record, and a court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). While the court considers whether the ALJ followed the applicable rules of law in weighing particular types of evidence in disability cases, the court will "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (internal quotation marks omitted). Even if a court might have reached a different conclusion, the Commissioner's decision stands if it is supported by substantial evidence. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002). But "an agency decision that either applies an incorrect legal standard or is unsupported by substantial evidence is subject to reversal." *Staheli*, 84 F.4th at 905.

## II.   Procedural History

Plaintiff filed applications for DIB and SSI on March 17, 2023, alleging a disability onset date of July 22, 2022. (AR, at 82-83, 93, 103, 268, 300). The SSA denied the applications initially and on reconsideration. (*Id*. at 110-19, 122-29). Then an administrative hearing was held on May 28, 2024. (*Id*. at 36-65). Afterwards, the Administrative Law Judge ("ALJ") issued a decision finding that Plaintiff was not disabled. (*Id*. at 10-23). The Appeals Council subsequently denied Plaintiff's request for review. (*Id*. at 1-6). Thus, the ALJ's decision became the final decision of the Commissioner. *See Wall v. Astrue*, 561 F.3d 1048, 1051 (10th Cir. 2009); 20 C.F.R. § 404.981.

## III.   The Administrative Decision

At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 22, 2022, the alleged onset date. (AR, at 12). At Step Two, the ALJ determined Plaintiff suffers from the severe impairments of gastroparesis, irritable bowel syndrome, degenerative disc disease of the lumbar and cervical spine, bilateral carpal tunnel syndrome, migraine headaches, and obesity. (*Id*. at 13). At Step Three, the ALJ found Plaintiff's impairments do not meet or medically equal any of the listed impairments. (*Id*. at 14). The ALJ then determined that Plaintiff had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant is able to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk 4 hours in an 8-hour workday, and sit for six hours in an 8-hour work day. Although the claimant is unable to climb ladders, ropes, or scaffolds, the claimant is able to frequently climb ramps and stairs. The claimant is able to frequently stoop, kneel, crouch, or crawl. The claimant is able to tolerate occasional work around moving machinery. Additionally, the claimant is able to frequently reaching [sic] overhead with

the upper extremities. The claimant is able to frequently handle and finger bilaterally. The claimant is able to understand, remember, and carry out simple instructions.

(*Id.* at 16-17). Then, at Step Four, the ALJ found Plaintiff could not perform any past relevant work. (*Id.* at 21). At Step Five, however, the ALJ found Plaintiff could perform jobs existing in significant numbers in the national economy, such as touch up screener and type copy examiner. (*Id.* at 22). Thus, the ALJ found that Claimant had not been under a disability since July 22, 2022. (*Id.* at 23).

## IV.    Claims Presented for Judicial Review

Plaintiff contends the ALJ erred in considering her migraine headaches and did not properly consider her alleged symptoms related to her gastrointestinal impairments. (Doc. 7, at 13-20). The Commissioner argues that the ALJ reasonably considered Plaintiff's migraine headaches and her alleged gastrointestinal symptoms. (Doc. 14, at 4-12). The Court finds the ALJ erred in considering Plaintiff's migraine headaches and does not reach the remaining issue.

## V.    The ALJ Did Not Properly Consider Plaintiff's Migraines When Formulating the RFC.

Plaintiff contends the ALJ failed to properly consider her migraine headaches. (Doc. 7, at 13-17). She asserts that "[d]espite finding the migraines are a severe impairment, the decision contains no evaluation of the frequency, duration, or symptoms of [her] migraines." (*Id.* at 14). The Court agrees and finds the ALJ did not properly consider Plaintiff's migraine headaches because the discussion of the record is deficient.

> A.   **The Legal Standard for Analyzing a Claimant's Alleged Symptoms**
>
> The Commissioner has a two-step process for evaluating a claimant's symptoms, that is, his or her subjective statements about his or her impairments and limitations. *See* SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). At the first step, the ALJ determines whether the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id*. at *3. If so, at the second step, the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms . . . and determine[s] the extent to which [a claimant's] symptoms limit his or her ability to perform work-related activities." *Id*. at * 4. In making this evaluation, the ALJ considers the medical evidence of record, along with several factors, including the claimant's activities of daily living. *See id*. at *7.

*James v. Comm'r, SSA*, 2024 WL 1133442, at *3 (10th Cir. Mar. 15, 2024). The factors other than the medical evidence are: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of medication; (5) treatment, other than medication, the claimant has received; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning functional limitations and restrictions. *See* Social Security Ruling ("SSR") 16-3p. 2017 WL 5180304, at *7-8.

### B.   The ALJ's Consideration of Plaintiff's Migraines

#### 1.   Medical Evidence and Plaintiff's Testimony

On March 22, 2022 – shortly before Plaintiff's alleged onset date – Dr. David N. Hollrah noted Plaintiff's complaint of "severe migraines which she experiences almost on a daily basis" that are accompanied by "severe visual aura with scintilla and scotoma" and "nausea with photophobia and phonophobia." (AR, at 484). The record notes that Plaintiff

7

took medication for the condition and Dr. Hollrah prescribed Qulipta to help with migraines and related nausea. (*Id.* at 483-84).

On August 11, 2022, Plaintiff presented to the emergency room complaining of numbness that came in waves, radiating from her feet to her head. (*Id.* at 373). She had a headache consistent with her migraines and endorsed "having associated photophobia, phonophobia, a visual aura that is common with her previous migraines, and nausea." (*Id.*) Plaintiff continued to complain of dizziness the next day. (*Id.* at 378). Plaintiff was "given a headache cocktail with resolution of her symptoms." (*Id.* at 379).

On August 22, 2022, Dr. Hollrah noted the ER visit and Plaintiff's report that her migraines had improved since beginning Qulipta in June 2022. (*Id.* at 436). Dr. Hollrah referred Plaintiff to neurology due to migraines. (*Id.* at 435).

Plaintiff presented to the emergency room on September 21, 2022, with a chief complaint of head pain. (*Id.* at 1417). She also reported nausea, photophobia, and sensitivity to noise. (*Id.* at 1418). The records reflect that the initial onset of symptoms was "1-2 Weeks Ago" and were constant. (*Id.*) Plaintiff reported that she has a history of "multi monthly" headaches. (*Id.*)

Plaintiff began visits at a neurology clinic on January 18, 2023. (*Id.* at 1053-60). Plaintiff reported a history of migraines dating to when she was 12 years old and described her medication history. (*Id.* at 1054). Notably, Plaintiff reported that Qulipta "helped significantly," but that she had to stop using it due to gastrointestinal problems. (*Id.*) At that time she had headaches two-or-three times per week which could last from a few hours to the whole day. (*Id.*) Nausea and vomiting often accompanied the headaches and she

8

felt as if her head was "going to explode." (*Id.*) She also reported "photophobia, phonophobia, osmophobia, and kinesiophobia." (*Id.*) Plaintiff began Emgality injections and was prescribed Relpax. (*Id.* at 1057).

At a follow-up visit on April 18, 2023, the medical record reflects that Plaintiff "did wonderful with her first 2 months of Emgality" and was down to one or two headaches per month. (*Id.* at 1036). But "since her insurance still has not responded yet to the 2 prior authorizations that [her medical provider had] submitted for her Emgality," Plaintiff was "back to having 2-3 headaches per week that last anywhere from few hours to all day long." (*Id.*) Plaintiff reported that she uses Relpax for more severe headaches which "worked well to reduce the intensity of the headache at the start of a headache." (*Id.* at 1040). No major changes were noted in the records for Plaintiff's follow-up visit on July 10, 2023. (*Id.* at 1253-59).

On November 2, 2023, Plaintiff reported that "she has continually done well on Emgality monthly injections without any side effects and has only had maybe 1 or 2 migraine headaches that were about 8 out of 10 in intensity since her last visit on 7/10/2023 that responded quickly to Relpax at the start of a headache and usually does not need to repeat dose 2 hours later." (*Id.* at 1342). Thus, the record reflects that Plaintiff's migraine condition was at that point "well-controlled on Emgality monthly injections without any side effects." (*Id.* at 1347). On February 7, 2024, a record from a follow-up visit reflects that "Emgality has still been working well and she has only had 1 total headache in the last 6 months." (*Id.* at 1432).

At the hearing on May 2, 2024, the following exchange took place between Plaintiff

9

and her attorney:

> Q: And on the migraines, I know that you – the injections have been helping with those. So, about how often do you still get a migraine?
>
> A: Maybe once a week.
>
> Q: Okay. And when they happen, about how long do they last at a time?
>
> A: Well, it could last quite a few hours.
>
> Q: And that's even with – do you take anything extra other than the Emgality?
>
> A: No, because I used to take Ibuprofen quite often, but I know that that hurts the stomach, so I try not to take anything to exacerbate what I already have going on. So, no, sir.

(*Id.* at 57-58).

### 2.  The ALJ's Consideration of Plaintiff's Migraines

The ALJ found Plaintiff's migraine headaches amounted to a severe impairment. (AR, at 13). When summarizing the medical record as part of formulating the RFC, the ALJ noted that Plaintiff had a CT scan showing no intracranial findings. (*Id.* at 18) (citing *id.* at 619). The ALJ also noted that Plaintiff was hospitalized between August 11, 2022, and August 13, 2022, where a doctor reported Plaintiff had "complicated migraines." (*Id.*) (citing *id.* at 379). Another CT scan at this hospital stay showed no acute intracranial abnormality. (*Id.*) (citing *id.* at 407). The ALJ also cited a record from November 2, 2023, at which a physician assistant reported that Plaintiff's migraines were well controlled. (*Id.* at 19) (citing *id.* at 1348). The ALJ concluded that "[w]hile [Plaintiff] reported migraine headaches, her injections have ameliorated the pain." (*Id.* at 20). Despite this finding, however, the ALJ attributed the mental limitations in the RFC – a limitation to

understanding, remembering, and carrying out simple instructions – in part to Plaintiff's migraines.  (*Id.* at 17, 20).

### C. The ALJ Failed to Discuss Significantly Probative Evidence Related to Plaintiff's Migraines.

Plaintiff claims the ALJ's discussion is deficient because "the decision contains no evaluation of the frequency, duration, or symptoms of [her] migraines."  (Doc. 7, at 14).  This argument is well-taken.  The ALJ's discussion of the evidence referenced Plaintiff's migraines and addressed one of the two emergency room visits associated with the condition.  (AR, at 18).  The ALJ also discussed one record from Plaintiff's visits to neurology specialists – a report from November 2, 2023 – in which her medical provider reported that Plaintiff's migraines were well-controlled.  (*Id.* at 19) (citing *id.* at 1348).  But the ALJ did not discuss Plaintiff's second migraine-related visit to the emergency department or the longitudinal record with Plaintiff's neurology specialists.  Indeed, the ALJ did not discuss the documented symptoms from Plaintiff's migraines or the difficulties she had in obtaining medication.  As noted above, Plaintiff repeatedly reported nausea, photophobia, and phonophobia – among other symptoms.  Nor did the ALJ's discussion of the record address the frequency at which Plaintiff has migraines – which at times amounted to multiple times per week during the relevant period.  Further, the ALJ failed to address Plaintiff's testimony casting doubt on the "well-controlled" nature of her migraines.

Plaintiff specifically takes issue with the ALJ's consideration of Emgality – the medication that the ALJ determined had ameliorated Plaintiff's migraine symptoms.  This

11

determination contributed to the ALJ's finding regarding limitations in the RFC. (*Id.* at 20). The Commissioner argues that "the Court should find no merit in Plaintiff's claim that she did not have access to Emgality for the entire period considered by the ALJ, that her medication did not have a significant effect until November 2023, and that by the time of the hearing, the migraines were reoccurring on a weekly basis." (Doc. 14, at 5) (citation modified). However, the undersigned agrees with Plaintiff that the ALJ did not properly consider the medication.

Plaintiff first took Emgality in January 2023. (AR, at 1057). In April 2023, the record indicates that Plaintiff's insurer had yet to approve the medication. (*Id.* at 1036). Thus, even though the medication had success, Plaintiff was at that time "back to having 2-3 headaches per week."[5] (*Id.*) In July 2023, Plaintiff reported her insurance had yet to approve the prescription. (*Id.* at 1254). In November 2023, the record reflects that Plaintiff only had one or two headaches since her July appointment. (*Id.* at 1342). And that success continued until February 2024. (*Id.* at 1432). But at the May 2, 2024, hearing, Plaintiff testified she had a migraine per week. (*Id.* at 57-58).

The only evidence the ALJ addressed regarding Emgality is the November 2023 report that Plaintiff's migraines were well controlled. (*Id.* at 19). He did not address or make any determination about when the migrinaes became well-controlled. There is conflicting evidence in this regard as Plaintiff reported increased headaches when her

---

[5] While the Commissioner argues "[t]here is nothing in the record regarding the amount of time she did not have access to Emgality," (Doc. 14, at 5), this evidence shows that Plaintiff was without Emgality for a sufficient amount of time for her migraine headaches to return to pre-Emgality levels in early 2023.

12

insurance company had not approved the medication. Because the ALJ never addressed Plaintiff's migraine symptoms or other medical records – with the exception of noting one migraine-related hospitalization – it is unclear whether the ALJ found Plaintiff's migraine symptoms without Emgality to be more limiting than the RFC. And because it is unclear from the decision when the medication began controlling the migraines, the record could be interpreted to reflect more limiting symptoms for a continuous 12-month period after the alleged onset date of July 22, 2022.

Additionally, Plaintiff testified that her migraines returned with weekly frequency at the time of the hearing. The ALJ did not address the testimony in the hearing. And by finding only that the "injections have ameliorated the pain," (*Id.* at 20), it appears the ALJ rejected Plaintiff's testimony.

Thus, the Court finds the ALJ's discussion of the migraine-related evidence violates the principle that an ALJ must demonstrate that he "considered all of the evidence" and must discuss not only the evidence supporting his decision, but also "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996); *see also Bryant v. Comm'r, SSA*, 753 F. App'x 637, 640-41 (10th Cir. 2018) (holding an ALJ may not "mischaracterize or downplay evidence to support [his] findings"); *Miller v. Saul*, No. CIV-19-1125-STE, 2020 WL 3559560, at *3 (W.D. Okla. June 30, 2020) ("Reversal is warranted due to the ALJ's omission of probative evidence, selective review, and lack of analysis regarding symptoms and limitations related to Plaintiff's migraine headaches."). Therefore, remand is appropriate on this basis.

**VI.     The Court Does Not Reach Plaintiff's Remaining Point of Error.**

Because the above error mandates remand, the Court declines to address Plaintiff's other argument on appeal, as it "may be affected by the ALJ's treatment of this case on remand." *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

**VII.    Conclusion**

Having reviewed the medical evidence of record, the transcript of the administrative hearing, the decision of the ALJ, and the pleadings and briefs of the parties, the Court **REVERSES** the Commissioner's decision and **REMANDS** the matter for further proceedings.

**IT IS SO ORDERED** this 17th day of November, 2025.

AMANDA L. MAXFIELD
UNITED STATES MAGISTRATE JUDGE